**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | | |
|---|---|---|
| JENNIFER SWARTZ, individually and on behalf of all persons similarly situated, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | |
| v. | : | Class/Collective Action |
| | : | |
| NEXT NET MEDIA, LLC, d/b/a The Hoth; | : | |
| | : | |
| CLEARVIEW CAPITAL, LLC | : | |
| | : | |
| Defendants. | : | |

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiff Jennifer Swartz ("Swartz" or "Plaintiff") through her undersigned counsel, individually and on behalf of all persons similarly situated, files this Class and Collective Action Complaint against Defendant Next Net Media, LLC ("NNM") and Clearview Capital, LLC. ("Clearview") (collectively "Defendants"), seeking all available relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*. ("FLSA") and the Michigan Improved Workforce Opportunity Wage Act, MCLS § 408.931 *et seq*, ("MIWOWA")

**JURISDICTION AND VENUE**

1.     Jurisdiction over Plaintiff's FLSA claims is proper under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.  Plaintiff's claims arising under state law are proper under 28 U.S.C. § 1367.

2.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391.  The transactions and occurrences in this matter arose in this District, where Plaintiff performed work for Defendants.

**PARTIES**

3.     Plaintiff Swartz is an individual currently residing in Shelby Township, Michigan. She was employed by Defendants as a Content Creator (specifically a topic creator and a

1

copywriter) from approximately April 2019 through approximately September 2023 and during this time period worked remotely for Defendants from her residence in Michigan. Pursuant to 29 U.S.C. § 216(b), Plaintiff Swartz has consented in writing to being a party plaintiff in this action. Ex. 1, Consent Form.

4.    Defendant Next Net Media, LLC ("NNM") is a Florida limited liability company headquartered in Saint Petersburg, Florida, and operating nationwide.

5.    Defendant Clearview Capital, LLC ("Clearview") is a Delaware limited liability company headquartered in Stamford, Connecticut, and operating nationwide.

6.    Defendants employ individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206-207.

7.    Defendants' annual gross volume of business exceeds $500,000.

## CLASS DEFINITION

8.    Plaintiff brings Count I of this lawsuit pursuant to the FLSA, 29 U.S.C. § 216(b) as a collective action on behalf of herself and the following class of potential opt-in litigants:

> All current or former content creators, including but not limited to: topic creators, content writers, quality control workers, editors and copywriters, who performed work in the United States for Next Net Media, LLC ("NNM"), including for NNM's Brands: The Hoth, FreeUp, Copymatic, iWriter, linkbuilder.io, SEO Jet and Authority Builders Co., within the past three years and who were classified as independent contractors (the "FLSA Class" or "Content Creators").

9.    Plaintiff brings Count II of this lawsuit pursuant to Fed. R. Civ. P. 23 as a class action on behalf of herself and the following class:

> All current or former content creators, including but not limited to: topic creators, content writers, quality control workers, editors and copywriters, who performed work in Michigan for Next Net Media, LLC ("NNM"), including for NNM's Brands: The Hoth, FreeUp, Copymatic, iWriter, linkbuilder.io, SEO Jet and Authority Builders Co., within the past three years and who were classified as

2

independent contractors (the "Michigan Class").

10.     Plaintiff reserves the right to redefine the FLSA Class and/or Michigan Class (jointly the "Classes") prior to notice or class certification, and thereafter, as necessary.

## FACTS

11.     In approximately April 2019, Plaintiff Swartz began work for NNM as a topic creator for NNM's largest online content creation and marketing brand property, "The Hoth."  See https://www.thehoth.com/ (last accessed, 10/10/2023).  Plaintiff served in this role through her termination in September 2023.

12.     During the timeframe of approximately August 2019 through April 2020, Plaintiff also served in the role of copywriter on The Hoth.

13.     Effective November 3, 2021, Plaintiff and NNM entered into an "Independent Contractor Agreement," Ex. 2, ("IC Agreement"), which to the extent lawful, governed the terms of the employment relationship between Plaintiff and NNM.

14.     NNM owns and operates several other similar online content creation and market brands, including but not limited to: FreeUp, Copymatic, iWriter, linkbuilder.io, SEO Jet and Authority Builders Co.,

15.     NNM offers approximately 21 different content creation services under The Hoth. See https://www.thehoth.com/products/ (last accessed 10/14/2023).

16.     Some of The Hoth's services (or some aspects of each service) are handled by NNM's recognized W-2 employees (i.e., not Class Members), while some services or aspects are handled by those NNM designates as 1099 independent contractors (Class Members).  However, the dividing line which NNM drew between W-2 employee and 1099 independent contractor was and is artificial and not based on the economic realities of the work relationship between these

NNM and those who work for it.  Indeed, all Class Members designated as independent contractors of Defendants were and are in reality their employees.

17.     NNM would assign Content Creators to work interchangeably on multiple teams and services across The Hoth brand.

<u>HOTH Blogger</u>

18.     For example, one of The Hoth's services is dubbed by NNM as "HOTH Blogger." HOTH Blogger is a content creation service for providing NNM's clients with SEO optimized blog content which helps these clients increase their web traffic.  NNM advertises HOTH Blogger as follows:

> Get high-quality blog content so you can attract and convert your target audience. This blog content service includes topic ideation, professional writers, and unlimited edits.

*Id*.

19.     During all relevant time periods, Plaintiff worked on NNM's HOTH Blogger service.  HOTH Blogger consists of three teams of workers: topic creators, content writers and quality control (QC) editors.  NNM classifies all of these workers as 1099 independent contractor. Plaintiff worked as a topic creator for the HOTH Blogger team.

20.     Plaintiff's duties as a topic creator for Defendants included: logging in to the Hoth portal, requesting assignments from NNM, ideating a blog idea from NNM's clients, researching the client's website and blog, researching topics within the client's niche and industry, SEO research to improve NNM's client's marketing by determining highest ranking keywords and meta descriptions, and ensuring that NNM's clients' desires were met in terms of writing tone and style (including any needed revisions).

21.     Once Plaintiff and other topic creators finished creating the topic and associated

information as described in the previous paragraph, the information would be submitted to NNM's client for approval.  If the client did not approve the topic, NNM required Plaintiff and other topic creators to edit their work on that topic – but without any communication with NNM's client (which NNM prohibited on pain of termination) and without any additional compensation.  If clarification of the client's desires was needed, NNM required Plaintiff and other topic creators to submit an order to NNM's support department (NNM's in-house W-2 employees), who would then reach out to the client for clarification.  This process would continue until NNM's client approved of the topic.

22.     Once NNM's client approved of the topic created, the order would be forwarded to NNM's blog writing queue, to be assigned to an NNM content writer for writing the article/blog post.  The content writer would write content based on the topic creator's ideation, implementing search engine optimization strategies in their writing.  The content writer was also forbidden by NNM from communicating with the client.

23.     Once the content writer completed writing the article, it would then be submitted to NNM's QC editors for editing and/or the content writer according to QC's instructions).  Once edited, the written product would be submitted to NNM's client (through The Hoth portal) for their final approval.  Again, no communication between any of topic creators, content writers, or QC editors and NNM's clients was allowed.

<u>HOTH Web Copy</u>

24.     From approximately August 2019 through April 2020, Plaintiff worked for NNM on its "HOTH Copy" service as a copywriter.

25.     HOTH Web Copy is a service whereby NNM's web copywriters create content for NNM's client websites.  In the web copy, copywriters would analyze NNM client websites for site

traffic, site titles, keywords, meta descriptions, etc. and make suggestions for improving the client's site traffic – e.g., altering the keywords, titles, meta descriptions, utilizing pay-per-click advertisings, etc.

26.    NNM copywriters would create an "Optimization Report" for NNM's clients which would contain the aforementioned recommendations.  However, the Optimization Report was largely a canned style report which would be filled out according to NNM policies and procedures. NNM copywriters were only paid a mere $5.00 per Optimization Report.  Plaintiff spent approximately one to two hours per Optimization Report.

27.    NNM Content Creators created and/or edited content in similar manners and under similar NNM company policies and procedures for other of The Hoth's and other NNM brand services.

28.    NNM brags to its potential clients about the extensive training it provides Content Creators:

**Your Content is Written by our Extensively Trained Writers**

At The HOTH, we guarantee that each writer for website copywriting is not only a native English speaker, but also possesses extensive writing experience and proven skills.

Our writers undergo specialized training in crafting conversion-focused website content, utilizing proven models that have successfully driven millions of dollars in sales.

You can be confident that your content needs are in the hands of experts.

See https://www.thehoth.com/web-copy/ (last accessed 10/17/2023) (emphasis in original).

29.    During the past three years, Plaintiff regularly worked a range of between approximately twenty-five (25) to fifty-five (55) hours per week.  Plaintiff frequently worked more than forty (40) hours per workweek.  Plaintiff typically produced approximately 100 to 330 topics

per week, at the rate of $2.50 per topics (or approximately $250 to $825 per week).  Plaintiff's pay typically ranged between approximately $6.00 to $12.00 per hour (without any overtime premium).  In some weeks during the past three years, Plaintiff made less than the federal and/or Michigan minimum wage.

30.     At no time was Plaintiff paid an overtime premium (1.5x) for her hours worked in excess of forty (40) in a week.

## EMPLOYMENT RELATIONSHIP

31.     Courts within the Third Circuit weigh several non-exclusive factors in order to determine whether, as a matter of "economic reality," an employment relationship exists.  In *Donovan v. DialAmerica Mktg., Inc*., 757 F.2d 1376, 1382 (3d Cir. 1985), the Court of Appeals for the Third Circuit considered the following factors:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanence of the working relationship;
> 6) whether the service rendered is an integral part of the alleged employer's business.

### *Defendants Hired, Fired and Exercised Control Over Content Creators*

32.     On or about March 28, 2019, in response to NNM's advertisement on Indeed, Plaintiff applied via Indeed to work for NNM as a topic creator.

33.     On or about late March or early April 2019, NNM administered a writing test to Plaintiff in order to consider her for hire.

34.     Because, among other things, Plaintiff's writing test was satisfactory to NNM, NNM hired Plaintiff as a topic creator.

7

35.     Defendants at times fired Content Creators when they did not follow Defendants' policies and procedures.

36.     Content Creators were also fired by Defendants at their whim.  On or about September 6, 2023, Plaintiff was fired immediately by NNM by being locked out of NNM's portal without reason or notice.

37.     Defendants maintained control over the manner in which Content Creators performed their services.

38.     Defendants required their Content Creators to undergo extensive training, the topics of which included but were not limited to:

   a.   General writing training;

   b.   Search engine optimization (SEO);

   c.   SEO titles and meta descriptions;

   d.   Web copy writing;

   e.   Writing effective blog post headlines;

   f.   Topic-specific trainings;

   g.   NNM company culture and work ethic, accountability, responsibility and communication.

39.     Defendants instituted extensive policies and procedures, which included, *inter-alia,* prohibiting Content Creators from utilizing:

   a.   Internal links to a homepage instead of a subpage;

   b.   Periods at the end of headers;

   c.   Links in headers;

   d.   Using Conclusion as the final header;

e.   Using given research links in the piece even though they are competitors;

f.   Starting sentences using the word "Which";

g.   Writing all paragraphs to be one sentence long instead of varied lengths;

h.   Not including enough internal links;

i.   Drafting a link that is a full sentence;

j.   Linking to other articles which are the same as the requested piece.

40.   Defendants' policies and procedures were enforced, *inter-alia*, via monthly "quality audits" in which NNM managers would review articles and topics written by Content Creators, as to whether the Content Creator adhered to company policies or not.   These audits also involved a punitive quality point system.   For example, 10 points would result in a warning, 15 points would result in suspension and 20 points, termination.   The results of the audit (including directions as to how to improve in the future) were communicated from NNM managers to Content Creators.

41.   Defendants retained the right to edit the work product produced by Content Creator. Furthermore, as an example, NNM's support team actually exercised such control by requiring Content Creators to revise their work according to specific feedback from NNM's clients and NNM's policies and procedures.   Any questions which a Content Creator had associated with an order by an NNM client, was answered by NNM's support team.

42.   Defendants set minimum production standards for Content Creators.   For example, NNM required topic creators and QC editors to produce at minimum 30 orders per week to remain on NNM's platform.   Similarly, NNM required content writers to write at least five (5) articles per week to remain on NNM's platform.   Similarly, topic creators were only allowed to request five (5) topics on NNM's portal at any given time.

43.     Defendants required that a given assignment be completed within eight (8) hours.

*Defendants Determined Content Creators' Rate and Method of Payment;*
*Content Creators Had Minimal Opportunity for Profit or Loss and*
*Did Not Materially Invest in Defendants' Business*

44.     Defendants set the terms of compensation through form adhesion contracts they entered into with Content Creators (IC agreements).  A topic creator would be paid only $2.50 per assignment/topic.  A content writer for would typically be paid only approximately $15 to $30 per article, depending on required word count.

45.     In their employment with Defendants, Content Creators possessed no significant opportunity for profit or for loss.  Although under the IC Agreements, Plaintiff and Content Creators were paid on a per-article basis, such compensation structure is in the nature of a piece-rate wage, not a right to share in profits.  See, e.g., 29 CFR § 778.111.

46.     Defendants prohibited Content Creators from soliciting Defendants' clients as their own clients, either during their employment with Defendants or for a period of five (5) years thereafter.

47.     Content Creators were not required to invest in equipment or materials with respect to their employment at Defendants.  Content Creators merely used their existing home computers and smart phones to perform services for Defendants.  Defendants invested millions of dollars in their IT systems and platform, which Content Creators relied upon to perform their work.

*Content Creators' Services Required No Special Skill or Independent Initiative*

48.     Content Creators' services required no special skill.  For example, no specific academic qualifications were required to be a Content Creator, much less a college degree.  Similarly, no specific professional experience was required.

*Content Creators' Employment Was in the Nature of a Permanent Relationship*

49.     Content Creators' employment with Defendants was in the nature of a permanent relationship.  Content Creators signed and labored under the terms of IC Agreements and regularly worked approximately well in excess of 40 hours per week for Defendants, for indefinite (i.e., permanent) periods of time.

*Content Creators' Services Were An Integral Part of Defendants' Business*

50.     Defendants are in the business of internet content creation and marketing. Defendants' very business could not exist without the content created by its Content Creators. Indeed, the content created by its writers and editors constitutes the entirety of the product offered by Defendants.  Without the existence of the content published on Defendants' client's websites, NNM would not have clients or a business at all.

51.     As a matter of economic reality, Plaintiff and Content Creators were dependent on Defendants for continued employment and income, and therefore were employees of Defendants.

**Defendants Are a Single Employer/Integrated Enterprise**

52.     At any given point in time within the last three years, one or both of NNM and Clearview directly employed Plaintiff and the FLSA Class.

53.     As of approximately September 2021, Clearview purchased a controlling stake in NNM and installed Clearview leadership into NNM leadership positions.   Clearview was responsible for drafting and promulgating the November 2021 IC Agreements to Class Members.

54.     Defendants were together functionally integrated in that they utilized the same or similar facilities (including Clearview's headquarters at 1010 Washington Boulevard, 11th Floor, Stamford, CT 06901), equipment, tools, and labor relations personnel.   Defendants each implemented and carried out the same labor relations policies including the compensation policies applicable to Plaintiff and the FLSA Class.  Defendants each exhibited common ownership and

control, including through at least Clearview, and Defendants' common LLC members, executive and owners: Calvin Neider (VP, Manager) and Geoffrey Faux, Jr. (VP, Secretary, Treasurer, Manager).

55.     Thus, Defendants constitute a single employer and an integrated enterprise.

### Overtime Premium Pay and Overtime Gap Time Pay Is Owed at the Highest Applicable State or Locally Mandated Rate

56.     When overtime pay is required under the FLSA, the "regular rate of pay" under 29 U.S.C. § 207 may be set by state or local statute, such as a local minimum wage law. *See* 29 C.F.R. 778.5 ("**Where a higher minimum wage than that set in the Fair Labor Standards Act is applicable to an employee by virtue of such other legislation, the regular rate of the employee, as the term is used in the Fair Labor Standards Act, cannot be lower than such applicable minimum**, for the words 'regular rate at which he is employed' as used in section 7 [regarding overtime] must be construed to mean the regular rate at which he is lawfully employed.") (emphasis added).

57.     Furthermore, in weeks in which overtime hours were worked, an employee may recover straight time wages at the applicable locally mandated rate. *Conner v. Cleveland Cty*., 22 F.4th 412, 416 (4th Cir. 2022) (overtime gap time claims actionable); *Amaya v. Power Design, Inc*., 833 F.3d 440 (4th Cir. 2016) (other labor statute can set a higher regular rate for overtime purposes under the FLSA).

58.     As Plaintiff was not paid either the locally mandated minimum wage under Michigan law, or any overtime premium pay, he is entitled to pursue claims under 29 U.S.C. § 207 for unpaid straight time wages at the locally mandated minimum wage and overtime pay at 150% of her legally applicable regular rate of pay.

59.     All FLSA Class members are similarly entitled to pursue claims for unpaid

overtime wages at 150% of their applicable regular rate of pay (pursuant to state or local law), as well as overtime gap time at the legally applicable regular rate of pay.

## WILLFULNESS

60.     In September 2017, Plaintiffs Cheryl Bradley and others filed an FLSA Collective Action with facts very similar to the instant case, *Bradley v. Vox Media, Inc*. (D.D.C. No. 17-1791) (the "*Bradley* Action").   The *Bradley* plaintiffs alleged that the Defendant Vox Media had misclassified its Site Managers (who managed sports websites for Vox Media's sports division "SB Nation") as independent contractors, in violation of the FLSA.   The *Bradley* Action was widely reported in the sports and legal media.[1]   Senior management of Defendants were aware of the *Bradley* Action since its inception.

61.     On September 4, 2018, Judge Collyer denied Vox Media's partial motion to dismiss the *Bradley* plaintiffs' willfulness claims under the FLSA.   *Bradley*, ECF Nos. 29, 30; *Bradley v. Vox Media, Inc.*, 320 F. Supp. 3d 178, 2018 WH Cases2d 317956 (D.D.C. 2018).   Senior management of Defendants were aware of this opinion.

62.     On September 5, 2018, the sports website Deadspin published an article revealing FanSided's treatment of its Site Experts and other content creator employees, which included negative feedback from many such employees concerning Defendants' labor and pay practices. The article likened the labor and pay practices of FanSided and SB Nation and specifically referenced the *Bradley Action*.   Senior management at Defendants were aware of this Deadspin article and its contents.

---

[1] *See, e.g.*, "Centennial woman who ran Avalanche website sues Vox Media on claims that SB Nation broke labor laws," Denver Post, 9/2/2017, *available at*:
https://www.denverpost.com/2017/09/02/cheryl-bradley-vox-media-lawsuit/ (last accessed 12/8/2022); "SB Nation Writers, Editors Win Class Status in Overtime Suit," Bloomberg Law, 3/7/2019.

63.     On March 6, 2019, Judge Collyer granted the *Bradley* plaintiffs' motion to conditionally certify a collective action of Site Managers under the FLSA. *Bradley*, ECF Nos. 36, 37; *Bradley v. Vox Media, Inc*., No. 17-1791 (RMC), 2019 BL 75887 (D.D.C. Mar. 06, 2019). This too was reported in the legal media.[2] Senior management at Defendants were aware of this opinion.

64.     In June 2020, Plaintiff Brandon Carusillo, filed an FLSA Collective Action with facts very similar to the instant case and to *Bradley, Carusillo v. FanSided, Inc. et al.,* No. 20-cv-4766-JPO (S.D.N.Y.) (the "*Carusillo* Action"). Carusillo alleged that the Defendant FanSided had misclassified its Site Experts (who managed sports websites for FanSided's team site network) as independent contractors, in violation of the FLSA. Senior management of Defendants were aware of the *Carusillo* Action since its inception.

65.     In September 2021, Judge Oetken denied FanSided's motion to dismiss the complaint and granted Plaintiffs' motion for conditional certification. *Carusillo v. FanSided, Inc.*, No. 20-CV-4766 (JPO), 2021 U.S. Dist. LEXIS 180014 (S.D.N.Y. Sep. 21, 2021). Senior executives at Defendants were aware of this opinion too.

66.     Given Defendants' awareness of the *Bradley* and *Carusillo* litigation and awareness resulting from routine due diligence reviews, Defendants knew it was illegal to classify Content Creators as independent contractors and to ensure they were paid minimum wages and overtime premium pay.

67.     Despite its continuing knowledge of the illegality of its practices, Defendants willfully and continually refused to pay its Content Creators minimum wages or overtime pay for overtime hours worked, and thus a three-year statute of limitations is applicable to Content

---

[2] *Supra*, n. 4.

Creators in this matter.  *See* 29 U.S.C. § 255(a).

68.     Defendants do not maintain accurate records of the actual hours that Content Creators worked each workday and the total hours worked each workweek as required by the FLSA.  *See* 29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c) (requiring employers to maintain payroll records for three years and time sheets for two years, including the exact number of hours worked each day and each week).

69.     Defendants knew that there was a substantial risk that Content Creators were employees and were not exempt from the FLSA's overtime requirements.

70.     Defendants are a sophisticated global media and marketing business worth in the billions of dollars.  Defendants have access to knowledgeable human resource specialists and competent labor counsel.

71.     Defendants have acted willfully and with reckless disregard of clearly applicable FLSA provisions by failing to compensate Content Creators with minimum wages and overtime premium pay of 150% of their regular rates of pay for overtime hours worked, as required by 29 U.S.C. §§ 206, 207.

## COLLECTIVE ACTION ALLEGATIONS

72.     Plaintiff brings this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Class defined above.

73.     Plaintiff desires to pursue his claims on behalf of herself and any individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

74.     Plaintiff and the FLSA Class are "similarly situated," as that term is used in 29 U.S.C. § 216(b), because, *inter alia*, all such individuals were misclassified as independent contractors, worked pursuant to Defendants' previously described common pay practices and, as

a result of such practices, were not paid overtime premium pay for overtime hours worked. Resolution of this action requires inquiry into common facts, including, *inter alia*, Defendants' common compensation, timekeeping, and payroll practices.

75.     Specifically, Defendants paid Plaintiff and the FLSA Class on generally a piece rate (per article) basis, but failed to ensure that at least the minimum wage was paid and that overtime premium pay was paid (including at the locally mandated regular rate of pay), in violation of 29 U.S.C. §§ 206, 207.

76.     The similarly situated employees are known to Defendants, are readily identifiable, and may be located through Defendants' business and human resource records.

77.     Defendants employ many FLSA Class Members.   These similarly situated employees may be readily notified of this action through direct U.S. mail and/or other appropriate means, and allowed to opt into it pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for overtime wage compensation, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## CLASS ACTION ALLEGATIONS

78.     Plaintiff Swartz seeks to proceed as a class action pursuant to Federal Rules of Civil Procedure Rule 23 on behalf of the Michigan Class.

79.     The putative class is so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number would be based are within the sole custody and/or control of Defendants, upon information and belief, Defendants have employed more than fifty (50) class members in Michigan during the Class Period.

80.     Among the proposed class, common questions of law and fact exist as to all

16

Michigan Class Members and predominate over any questions that affect only individual Michigan Class Members.  Those common questions include, but are not limited to:

      a.   Whether Defendants misclassified Michigan Class Members as independent contractors;

      b.   Whether Defendants paid Michigan Class Members at least the minimum wage under Michigan law;

      c.   Whether Defendants paid Michigan Class Members an overtime premium for all overtime hours worked.

81.    Plaintiff Swartz' claims are typical of those belonging to members of the Michigan Class in that: (1) Plaintiff Swartz is a member of the Michigan Class; (2) Plaintiff Swartz' claims arise from the same practice or course of conduct that forms the basis of the Michigan Class claims; (3) Plaintiff Swartz' claims are based upon the same legal and remedial theories as those of the Michigan Class and involve similar factual circumstances; (4) there is no antagonism between the interests of Plaintiff Swartz and absent Michigan Class Members; and (5) the injuries that Plaintiff Swartz suffered are similar to the injuries that Michigan Class Members suffered.

82.    Plaintiff Swartz will fairly and adequately represent the Michigan Class.  There is no conflict between Plaintiff Swartz' claims and those of other Michigan Class Members.  Plaintiff Swartz has retained counsel who are skilled and experienced in class actions and who will vigorously prosecute this litigation.

83.    The Michigan Class is readily ascertainable from Defendants' own records.

84.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, the damages suffered by individual Michigan Class Members may be relatively small and the expense

and burden make it impracticable for Michigan Class Members to individually seek redress.

85.    Plaintiff Swartz knows of no difficulty that might be encountered in the management of this litigation that would preclude its maintenance as a class action.

## COUNT I
### Unpaid Minimum Wage and Overtime Violations, 29 U.S.C. §§ 206, 207
### (On Behalf of the FLSA Class)

86.    All previous paragraphs are incorporated as though fully set forth herein.

87.    The FLSA requires that covered employees be compensated for all hours worked at rates of at least the minimum wage.  *See* 29 U.S.C. § 206.

88.    The FLSA further requires that covered employees be compensated at 150% of their regular hourly rate for all hours worked in excess of 40 each workweek.  *See* 29 U.S.C. § 207.

89.    Defendants are subject to the wage requirements of the FLSA because Defendants are each an "employer" under 29 U.S.C. § 203(d).

90.    At all relevant times, Defendants have each been an "employer" engaged in interstate commerce and/or in the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

91.    During all relevant times, Plaintiff and the FLSA Class have been covered employees entitled to the above-described FLSA's protections.  *See* 29 U.S.C. § 203(e).

92.    Plaintiff and the FLSA Class are not exempt from the requirements of the FLSA. Plaintiff and the FLSA Class are entitled to be paid at least at the minimum wage and at 150% of their regular hourly rate (which is based on the higher of the class members' actually-paid rate of pay or minimum rate of pay set by state or local law) for all hours worked in excess of 40 each workweek, as well as overtime gap time pay at the legally mandated regular rate of pay.  See

18

*Conner v. Cleveland Cty.*, 22 F.4th 412, 415 (4th Cir. 2022) (approving of DOL regulation 29 C.F.R. § 778.315); 29 C.F.R. § 778.5.

93.     Defendants' compensation scheme, applicable to Plaintiff and the FLSA Class, failed to comply with 29 U.S.C. §§ 206, 207.

94.     Defendants knowingly failed to compensate Plaintiff and the FLSA Class with wages of at least the federal minimum wage, in violation of 29 U.S.C. § 206.

95.     Defendants knowingly failed to compensate Plaintiff and the FLSA Class with overtime premium pay for each hour of overtime worked, in violation of 29 U.S.C. § 207.

96.     Defendants also failed to make, keep, and preserve records with respect to Plaintiff and the FLSA Class sufficient to determine their wages, hours, and other conditions of employment in violation of the FLSA.  29 U.S.C. § 211(c); 29 C.F.R. §§ 516.5(a), 516.6(a)(1), 516.2(c).

97.     In violating the FLSA, Defendants acted willfully and with reckless disregard of clearly applicable FLSA provisions.

98.     Pursuant to 29 U.S.C. § 216(b), employers such as Defendants, who intentionally fail to pay an employee wages in conformance with the FLSA shall be liable to the employee for unpaid wages (including overtime wages and overtime gap time pay at the locally mandated rate), liquidated damages, court costs and attorneys' fees incurred in recovering the unpaid wages.

**<u>COUNT II</u>**
**Violations of the Michigan Improved Workforce Opportunity Wage Act**
**(On Behalf of the Michigan Class)**

99.     Plaintiff Swartz, re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth here.

100.     All previous paragraphs are incorporated as though fully set forth herein.

101.    The Michigan Improved Workforce Opportunity Wage Act, MCLS § 408.931 *et seq*, ("MIWOWA") requires that covered employees be compensated for all hours worked, at rates of at least Michigan's minimum wage, MCLS § 408.934(1).

102.    The MIWOWA also requires that covered employees be compensated for all hours worked in excess of forty (40) hours per week at 150% of the employee's regular rate of pay (which cannot be less than the state minimum wage) ("Overtime Rate").  *See* MCLS § 408.934a(1).

103.    Defendants are subject to the minimum wage and overtime requirements of the MIWOWA because Defendants are employers under MCLS § 408.932(d).

104.    During all relevant times, Plaintiff and the Michigan Class were covered employees entitled to the above-described MIWOWA protections.  *See* MCLS § 408.932(c).

105.    Defendants failed to compensate Plaintiff and the Michigan Class at for all hours worked at least at the Michigan minimum wage, in violation of MCLS § 408.934(1).

106.    Defendants also failed to compensate Plaintiff and the Michigan Class at an Overtime Rate for hours worked in excess of forty (40) hours per week, in violation of MCLS § 408.934a(1).

107.    Pursuant MCLS § 408.939(1)(a), employers, such as Defendants, who fail to pay an employee wages in conformance with the MIWOWA shall be liable to the employee for the wages or expenses not paid, interest, court costs and attorneys' fees incurred in recovering the unpaid wages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief individually and on behalf of all others similarly situated:

      a.    An order permitting this litigation to proceed as an FLSA collective action pursuant to 29 U.S.C. § 216(b);

b. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential FLSA Class members;

c. An order permitting the Michigan Class to proceed in its claims as a class action under Fed. R. Civ. P. 23;

d. Back pay damages (including unpaid minimum wages, overtime gap time wages and overtime wages) and prejudgment interest to the fullest extent permitted under the law;

e. Liquidated damages and penalties to the fullest extent permitted under the law;

f. Litigation costs, expenses, and attorneys' fees to the fullest extent permitted under the law; and

g. Such other and further relief as this Court deems just and proper.


Dated:  January 3, 2024                              Respectfully Submitted,

                                                    /s/ James E. Goodley
                                                    James E. Goodley (PA Bar No. 315331)
                                                    Ryan P. McCarthy (PA Bar No. 323125)
                                                    GOODLEY MCCARTHY LLC
                                                    1650 Market Street, Suite 3600
                                                    Philadelphia, PA 19103
                                                    Telephone: (215) 394-0541
                                                    james@gmlaborlaw.com
                                                    ryan@gmlaborlaw.com

                                                    *Attorneys for Plaintiff and the Classes*