# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **JENNIFER SWARTZ, individually and on behalf of all persons similarly situated,** | : | |
| | : | |
| | : | |
| | : | **CIVIL ACTION NO.:** |
| **Plaintiff,** | : | **2:24-cv-10018** |
| | : | |
| **v.** | : | |
| | : | **Hon. Mark A. Goldsmith** |
| | : | |
| **NEXT NET MEDIA, LLC, d/b/a The Hoth;** | : | **Hon. Mag. Judge David R. Grand** |
| | : | |
| | : | **Class/Collective Action** |
| **CLEARVIEW CAPITAL, LLC** | : | |
| | : | |
| **Defendants.** | | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' <u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Dated:  March 26, 2024

**GOODLEY MCCARTHY LLC**
James E. Goodley
PA Attorney ID: 315331
james@gmlaborlaw.com
Ryan P. McCarthy
PA Attorney ID: 323125
ryan@gmlaborlaw.com
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 394-0541

*Attorneys for Plaintiff and the Classes*

## STATEMENT OF ISSUES PRESENTED AND
## CONTROLLING AUTHORITIES

**I.     Whether the Plaintiff's claims are <u>not</u> subject to arbitration, because the purported arbitration agreement is internally inconsistent and only requires arbitration of contractual claims, not the statutory claims asserted in this action.**

Plaintiff's Answer, "Yes"

Defenant's Answer, "No"

This Court should answer, "Yes."

Most controlling or persuasive authorities: *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022) (explaining that FAA policy "'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place [arbitration] agreements upon the same footing as other contracts…. But a court may not devise novel rules to favor arbitration over litigation."); *Bari Builders, Inc. v. Hovstone Props. Fla., LLC*, 155 So. 3d 1160, 1162 (Fla. 4th DCA 2014) ("The arbitration clause must be read together with the other provisions in the contract."); *Suess v. Suess*, 289 So. 3d 525, 529-530 (Fla. 2d DCA 2019) ("the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties."); *Gorman v. Kelly*, 658 So. 2d 1049, 1052 (Fla. 4th DCA 1995) ("In finding the contract ambiguous, that is susceptible of both parties' interpretations, the contract must be construed against the draftsman."); *Saunders v. St. Cloud 192 Pet Doc Hosp., LLC*, 224 So. 3d 336, 338 (Fla. 5th DCA 2017) ("Although the employment agreement created the legal relationship between Pet Doc and Saunders, her claims did not relate directly to the contract itself…. Instead, Saunders's complaint addressed Pet Doc's duties under an Osceola County Ordinance (employer sex discrimination) and common law (negligence), not any particular duties created by the contract… Even without entering this agreement, Saunders could have raised the identical claims.").

**II.     Alternatively, whether this Court should strike the class and collective action allegations in the Complaint pursuant to the same ambiguous and internally inconsistent arbitration agreement.**

Plaintiff's Answer, "No"

Defendant's Answer, "Yes"

The Court should answer, "No"

Most controlling or persuasive legal authorities: same as Section I above.

III.    **Alternatively, whether Plaintiff has alleged sufficient facts to plausibly allege Defendant Clearview Capital is a single employer with Defendant Next Net Media LLC, or similarly, whether Defendants together constitute a singular "enterprise" within the meaning of the Fair Labor Standards Act.**

Plaintiff's Answer, "Yes"

Defendants' Answer, "No"

The Court should answer, "Yes"

Most controlling or persuasive legal authorities: *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 & n.4 (6th Cir. 1997) (explaining that two companies may be considered "so interrelated that they constitute a single employer subject to liability. . ."); *Reich v. Gateway Press*, 13 F.3d 685, 694 (3d Cir. 1994) ("The minimum wage and overtime requirements apply not only to employees who engage in commerce or in the production of goods for commerce, but also to employees of an "enterprise engaged in commerce." 29 U.S.C. §§ 206, 207. To be considered an enterprise, a business must satisfy three elements. It must 1) be engaged in related activities, 2) under unified operation or common control, and 3) have a common business purpose. 29 U.S.C. § 203(r)(1); *Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 229 (3d Cir. 1991). If a group of businesses have these three characteristics, the businesses will be treated as a single entity for purposes of applying the FLSA.").

## I. INTRODUCTION

Defendant Clearview Capital, L.P. ("Clearview") (a private equity company) and its portfolio company, Defendant Next Net Media, LLC, d/b/a The Hoth ("NNM") (collectively, "Defendants") ask the Court to rewrite NNM's contract with Plaintiff Jennifer Swartz ("Plaintiff" or "Swartz") such that the statutory wage claims at issue in this lawsuit (which Plaintiff never agreed to arbitrate with Defendants) are arbitrable. Although the parties agree that the Supreme Court has endorsed arbitration agreements, Defendants fail to acknowledge that FAA policy "'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to **place [arbitration] agreements upon the same footing as other contracts**.'" *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022) (quoting *Granite Rock* Co. v. *Teamsters*, 561 U. S. 287, 302 (2010) (emphasis added). In other words, "a court must hold a party to its arbitration contract just as the court would to any other kind. **But a court may not devise novel rules to favor arbitration over litigation**." *Morgan* at 1713 (citing *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 218-221 (1985) (emphasis added). Result-oriented "novel rules" are exactly what Defendants request the Court deploy in this case to unreasonably interpret the

Contract[1] they drafted so that they can limit their wage and hour liability to a single worker to whom they denied minimum wages and overtime.

Defendants (sophisticated parties), appear to have taken a stock two-page mandatory arbitration agreement and incorporated it into their general "Independent Contractor Agreement" (which as of late 2021 they forced content creators such as Plaintiff to sign as a condition of employment). However, Defendants defined terms such as "Agreement" inconsistently <u>throughout the entire Contract</u>, including in the Arbitration Agreement. In seeking to read certain portions of the Contract (i.e., the Arb. Agr.) in isolation to attempt to achieve their currently desired result (dismissal of a class action), Defendants ignore governing Florida contract law: "it is well-settled law that a single term in an arbitration clause cannot be interpreted in isolation, but must be read together with the rest of the contract." *Kendall Imps., LLC v. Diaz*, 215 So. 3d 95, 102 (Fla. 3rd DCA 2017).

The Independent Contractor Agreement contains the following provision relating to dispute resolution: "Each party agrees that any action by either party **to enforce the terms of this Agreement** shall be subject to mandatory arbitration, as

---

[1] "Contract" shall refer to the entirety of Exhibit 2 to Plaintiff's Complaint, ECF No. 1-2.  "Independent Contractor Agreement" or "ICA" shall refer to the portion of the Contract which is <u>not</u> the Mandatory Arbitration and Class Action Waiver Agreement (Exhibit A).  "Arbitration Agreement" or "Arb. Agr." shall refer to Mandatory Arbitration and Class Action Waiver Agreement (Exhibit A) to the Contract.

set forth in Exhibit A." **ICA ¶ 11(b)** (emphasis added).  The ICA requires a party who wishes to pursue a claim against the other <u>for breach of the ICA</u>, has to do so via arbitration. Thus, by operation of **ICA ¶ 11(b),** the arbitration agreement at Exhibit A only comes into play when the "action" is to "enforce the terms of this [IC] Agreement." This wage and hour case does not seek to enforce the terms of the IC Agreement, and therefore, Exhibit A is not applicable.

Additionally, the Arbitration Agreement is also referred to in the Contract, simply as the "Agreement." The Arbitration Agreement itself states that "any dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the validity, enforceability or breach of this Agreement, shall then be resolved by binding arbitration in accordance with the AAA Rules..." **Ex. A ¶ 2.**

Due to the differing meanings of the term "Agreement," Defendant's contract is, *at best for Defendants*, ambiguous and self-contradictory. One section in the Contract (**ICA ¶ 11(b)**) mandates only contractual claims be resolved through arbitration, whereas use of the term "Agreement" in the Arbitration Agreement means "any dispute or controversy arising out of or related to the Contractor's engagement with Company..." **Ex. A ¶ 1.** Notably, the Arbitration Agreement does not mention statutory claims as being within its scope.

Defendants cannot now ask the Court to rewrite the Parties' Contract to obtain what in hindsight Defendants now believe to be an undesirable result: facing the

consequences of their reckless misclassification of Content Creators in the form of an expensive class-action lawsuit. *Suess v. Suess*, 289 So. 3d 525, 529-530 (Fla. 2d DCA 2019) ("a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.") (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995).

Defendants could have *easily* taken the time to draft their Contract such that statutory claims would unmistakably be subject to arbitration. If Defendants did so, Plaintiff and other Content Creators would have had the opportunity to decide whether they wished to work for Defendants under those terms. Since Defendants did <u>not</u> require mandatory arbitration of non-contract claims in their Contract, **ICA ¶ 11(b),** it cannot be said that the Parties had a meeting of the minds as to mandatory arbitration of the statutory claims asserted in this action.

Defendants also argue that an arbitrator and not the Court should determine whether the claims raised in this lawsuit fall within the scope of the arbitration agreement, but this presupposes a meeting of the minds regarding arbitrability, which does not exist. "The Supreme Court requires 'clear and unmistakable' evidence that the parties intended to delegate gateway issues to the arbitrator." *Ciccio v. SmileDirectClub, LLC*, 2 F.4th 577, 583 (6th Cir. 2021) (citations omitted). Again, the delegation language cited by Defendants from Exhibit A is only applicable when the action concerns enforcement of the terms of the ICA. **ICA ¶**

4

**11(b).** Furthermore, where the Contract in question (which was drafted by Defendants) has conflicting and inconsistent terms regarding arbitration (e.g., definitions of "Agreement"), there cannot be "clear and unmistakable evidence that the parties intended to delegate gateway issues to the arbitrator."

Defendants make an alternate request that if this case is not dismissed, the Court strike any class/collective allegations due to a class/collective action waiver in the Arbitration Agreement. MTD at pp. 19-21. But as the Arb. Agr. does not cover the claims in this lawsuit, there is no basis for striking the class/collective action allegations and claims based on the Arbitration Agreement's class waiver clause. Defendants request that the Court limit their wage and hour liability to a single worker by "rewrit[ing] the contract to make it more reasonable or advantageous" to them. *Suess*, 289 So. 3d at 529-530. The Court should not entertain Defendants' buyers' remorse as to the Contract they drafted and entered. Accordingly, Defendants' Motion to Dismiss should be denied in its entirety.

## II.   PROCEDURAL HISTORY

Plaintiff adopts Defendants' Statement of Procedural History, MTD at pp. 2-3.  However, Plaintiff takes issue with Defendants' unfair characterizations of a prior (voluntarily dismissed) action that Plaintiff filed in the District of New Jersey (No. 23-cv-21349) and the instant lawsuit supposedly being a "second bite at the proverbial apple" and "an effort at forum shopping." MTD at pp. 1. It is correct that:

Plaintiff filed the D.N.J. action, that Defendants moved to dismiss/transfer that action due to lack of personal jurisdiction, that Plaintiff then voluntarily dismissed that action under Fed. R. Civ. P. 41(a)(1)(A)(ii), and that Plaintiff refiled the instant action in this Court shortly thereafter (where jurisdiction is undoubtedly appropriate). However, Plaintiff's refiling of the case in this Court was not an effort at "forum shopping." Rather, after reviewing Defendants' arguments regarding the differences of a limited liability company's citizenship for purposes of diversity versus personal jurisdiction, Plaintiff made the good faith and proper decision to voluntarily dismiss the D.N.J. action (because Plaintiff agreed personal jurisdiction was not proper in NJ), and refiled in the E.D. Mi., where all parties agree personal jurisdiction exists (Defendant has not moved to dismiss on personal jurisdiction grounds). Though Defendants would rather litigate in Florida, there is nothing improper about Plaintiff re-filing in E.D. Mi. where personal jurisdiction is proper. The Court should not consider Defendants' misleading characterizations of Plaintiff's actions prior to filing in this Court as a basis to dismiss the current action.

## III.   FACTUAL BACKGROUND

In April 2019, Plaintiff began work for NNM as a topic creator for "The Hoth," NNM's "largest online creation and marketing brand property." **Compl. ¶ 11**. Plaintiff worked as a topic creator through her termination in September 2023. *Id*. From about August 2019 through April 2020, Plaintiff concurrently served in the

role of copywriter for The Hoth. *Id*. ¶ **12**. On or about November 3, 2021, Plaintiff and NNM entered into an "Independent Contractor Agreement." *Id*. ¶ **13, Ex. 2 to Compl**. NNM "owns and operates several other similar online content creation and market[ing] brands, including but not limited to FreeUp, Copymatic, iWriter, linkbuilder.io, SEO Jet and Authority Builders Co." *Id*. ¶ **14**. Some of The Hoth's services are performed by those NNM recognizes as W-2 employees (not Plaintiff or Class Members), while other services are performed by those NNM designates as 1099 independent contractors ("IC") such as Plaintiff and Class Members. *Id*. ¶ **16**. Nonetheless, "the dividing line which NNM drew between W-2 employee[s] and 1099 [ICs] was and is artificial and not based on the economic realities of the work relationship" between Plaintiff/Class Members and NNM. *Id*.

During the Class Periods (3 years prior to the Complaint through present), "Plaintiff regularly worked a range of between approximately twenty-five (25) to fifty-five (55) hours per week" and "frequently worked more than forty (40) hours per workweek." *Id*. ¶ **29.** Plaintiff "typically produced approximately 100 to 330 topics per week, at the rate of $2.50 per topic[] (or approximately $250 to $825 per week)." *Id*. Plaintiff's pay "typically ranged between approximately $6.00 to $12.00 per hour (without any overtime premium)." *Id*. "In some weeks during the past three years, Plaintiff made less than the federal and/or Michigan minimum wage." *Id*.

After Plaintiff applied to NNM's job advertisement on Indeed, NNM administered a writing test to vet her for hire. *Id.* ¶¶ **32-33.** Because NNM found Plaintiff's test results satisfactory, it hired Plaintiff. *Id*. Defendants maintained and enforced extensive policies and procedures concerning writing style and search engine optimization (SEO), including on pain of termination. *Id.* ¶¶ **35-39.** Defendants also set and enforced minimum production standards, conducted monthly "quality audits" of Class Members' work, and required the Class to edit their work in accordance with Defendants' policies and procedures. *Id.* ¶¶ **40-43**.

The Independent Contractor Agreement states that "Contractor is hereby engaged by Company as an independent contractor to provide certain services as mutually agreed upon by Company and Contractor from time to time." **ICA ¶ 1.** The ICA also contains the following provision relating to dispute resolution:

> *Governing Law and Venue.* This Agreement shall be construed, interpreted and enforced in accordance with the laws of the State of Florida, without effect to its conflict of law provisions. Each party agrees that **any action by either party <u>to enforce the terms of this Agreement</u> shall be subject to mandatory arbitration, as set forth in Exhibit A.** To the extent the mandatory arbitration provisions of Exhibit A <u>do not apply</u>, each party agrees that any action brought by either party <u>to enforce the terms of this Agreement</u> shall be brought exclusively by the other party in an appropriate state or federal court in Florida and waives all objections based upon lack of jurisdiction or improper or inconvenient venue of any such court.

**ICA ¶ 11(b)** (emphasis added).

The Arbitration Agreement (Ex. A to the ICA) provides a "Coverage" section providing that "[t]his Agreement applied to any dispute or controversy arising out of or related to Contractor's engagement with Company, its affiliates," **Arb. Agr. ¶ 1,** and further that "any dispute or controversy covered by this Agreement, or arising out of, relating to, or concerning the validity, enforceability or breach of this Agreement, shall then be resolved by binding arbitration in accordance with the AAA Rules..." **Arb. Agr. ¶ 2.** Finally, the Arbitration Agreement contains a class/collective action waiver applying to claims within its scope. **Arb. Agr. ¶ 3.**

## IV.   ARGUMENT & AUTHORITIES

### A.   STANDARD ON A MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007)).  When reviewing a motion to dismiss, the court "must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and examine whether the complaint contains sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Norris v. Stanley*, 73 F.4th 431, 435 (6th Cir. 2023) (internal citations and quotations omitted).

### B.   FEDERAL CASE LAW ON ARBITRATION AND THE FAA

"A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Congress enacted the FAA in response to widespread judicial hostility to arbitration." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013). The FAA "reflects the overarching principle that arbitration is a matter of contract. And consistent with that text, courts must rigorously enforce arbitration agreements according to their terms." *Id*. at 2309.

However, this FAA policy "'is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate **and to place such agreements upon the same footing as other contracts**.'" *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1713 (2022) (quoting *Granite Rock* Co. v. *Teamsters*, 561 U. S. 287, 302 (2010) (emphasis added). In other words, "a court must hold a party to its arbitration contract just as the court would to any other kind. **But a court may not devise novel rules to favor**

**arbitration over litigation**." *Morgan* at 1713 (citing *Dean Witter Reynolds Inc.* v. *Byrd*, 470 U. S. 213, 218-221 (1985)) (emphasis added).

### C.    FLORIDA CASE LAW ON ARBITRATION

In 2013, the Florida Supreme Court summarized the law on scope of arbitration clauses, stating:

> Two basic types of arbitration provisions have emerged: (1) provisions with language and application narrow in scope, and (2) provisions with language and application broad in scope. *See Seifert*, 750 So. 2d at 636-37. An arbitration provision that is considered to be narrow in scope typically requires arbitration for claims or controversies "arising out of" the subject contract. *See id*. at 636. This type of provision limits arbitration to those claims that have a direct relationship to a contract's terms and provisions. *See id*. In contrast, an arbitration provision that is considered to be broad in scope typically requires arbitration for claims or controversies "arising out of *or relating to*" the subject contract. *See id*. at 637 (emphasis added). The addition of the words "relating to" broadens the scope of an arbitration provision to include those claims that are described as having a "significant relationship" to the contract—regardless of whether the claim is founded in tort or contract law. *See id*. at 637-38.

*Jackson v. Shakespeare Found., Inc*., 108 So. 3d 587, 593 (Fla. 2013). However, "even in contracts containing broad arbitration provisions, the determination of whether a particular claim must be submitted to arbitration necessarily depends on the existence of <u>some nexus between the dispute and the contract containing the arbitration clause</u>." *Seifert v. United States Home Corp.*, 750 So. 2d 633, 638 (Fla. 1999) (emphasis added). Furthermore, "the mere fact that the dispute would not have arisen but for the existence of the contract and consequent relationship between the

parties is insufficient by itself to transform a dispute into one 'arising out of or relating to' the agreement." *Id*.

Thus, Florida courts have found that even parties to employment contracts with "broad" arbitration clauses were not held to arbitrate their non-contractual claims. See, e.g., *Saunders v. St. Cloud 192 Pet Doc Hosp., LLC*, 224 So. 3d 336, 338 (Fla. 5th DCA 2017) ("Although the employment agreement created the legal relationship between Pet Doc and Saunders, her claims did not relate directly to the contract itself.... Instead, Saunders's complaint addressed Pet Doc's duties under an Osceola County Ordinance (employer sex discrimination) and common law (negligence), not any particular duties created by the contract... Even without entering this agreement, Saunders could have raised the identical claims."); *Club Mediterranee, S.A. v. Fitzpatrick*, 162 So. 3d 251, 253 (Fla. 3rd DCA 2015) ("The factual allegations of the complaint in this case do not rely in any respect on the employment agreement between Megan Fitzpatrick and her employer. *See Seifert*, 750 So. 2d at 641. There is no nexus between the terms and provisions of that agreement and the [sexual] assault on Megan Fitzpatrick. The trial court correctly denied Club Med's motion to compel arbitration"). *Cf. Dewees v. Johnson*, 329 So. 3d 765, 772 (Fla. 4th DCA 2021) ("we agree with Dewees that there is no significant relationship between her claims against the developer and the Purchase Contract.

This case involves tort claims based on the developer's alleged breach of its nondelegable duty to maintain its premises in a safe and reasonable manner...").

By contrast, Florida courts have compelled arbitration where the claims had a significant nexus to the parties' contract containing the arbitration clause.  See, e.g., *Calvary Chapel Church v. Happ*, 353 So. 3d 649, 652 (Fla. 4th DCA 2023) (compelling arbitration in wrongful death action where, "the complaint expressly relies on the enrollment contract and handbook to establish the School's duty to the student, the alleged breach of which formed the basis of the wrongful death action"); *Aztec Med. Servs. v. Burger*, 792 So. 2d 617, 623 (Fla. 4th DCA 2001) (plaintiff's "statutory claim [is] plainly governed by the terms of the parties' agreement - and hence, the 'contractual nexus' is satisfied. In fact, a review and analysis of the agreement is necessary to determine whether or not the claims were paid timely and whether Aztec improperly coded the claims submitted - the factual allegations at the core of the unfair trade practices claim.").

### D.   PLAINTIFF'S STATUTORY CLAIMS FALL OUTSIDE THE SCOPE OF THE ARBITRATION AGREEMENT

#### 1.   The Contract Contains Inconsistencies and is Ambiguous

"It is well-settled law that a single term in an arbitration clause cannot be interpreted in isolation, but must be read together with the rest of the contract." *Kendall Imps., LLC v. Diaz*, 215 So. 3d 95, 102 (Fla. 3rd DCA 2017). See also *Bari Builders, Inc. v. Hovstone Props. Fla., LLC*, 155 So. 3d 1160, 1162 (Fla. 4th DCA

2014) ("The arbitration clause must be read together with the other provisions in the contract."). The Contract contains two portions: the ICA and the Arbitration Agreement. However, each portion of the Contract refers to a contradictory definition of the term "Agreement": (1) the ICA and (2) the Arbitration Agreement. Due to the differing meanings of the term "Agreement," one section in the Contract (**¶ 11(b)** of the ICA) mandates that only *contractual* claims be resolved through arbitration, whereas use of the term "Agreement" in Exhibit A means "any dispute or controversy arising out of or related to the Contractor's engagement with Company..." **Arb. Agr. ¶ 1** (though even the Arbitration Agreement does not explicitly mention statutory claims as being within its scope).

The Court's task then is to reconcile these seemingly conflicting definitions of "Agreement" if at all possible. See, e.g., *Arthur Rutenberg Corp. v. Pasin*, 506 So. 2d 33, 34 (Fla. 4th DCA 1987) ("A primary rule of contract construction is that where provisions in an agreement appear to conflict, they should be construed so as to be reconciled, if possible."); *Kendall Imps*. at 102 ("...the court must try to reconcile the conflicting [arbitration] provisions, just as it would do with any other contract provision."). But it is also black letter law that where a contract is ambiguous, the contract must be construed against the party that drafted it. See, e.g., *Gorman v. Kelly*, 658 So. 2d 1049, 1052 (Fla. 4th DCA 1995) ("In finding the contract ambiguous, that is susceptible of both parties' interpretations, the contract

must be construed against the draftsman."). There is nothing prohibiting interpreting the ambiguity in the Contract against Defendants in accordance with ordinary contract principles. The goal of the FAA was "to place such agreements upon the same footing as other contracts.'" *Morgan,* 142 S. Ct. at 1713.

Additionally, the ICA states that the arbitration agreement at Exhibit A only comes into play to enforce the terms of the ICA. **ICA ¶ 11(b).** Thus, only contractual claims are subject to arbitration, **ICA ¶ 11(b)**.

For the same reasons (inconsistent terms and Exhibit A only coming into play regarding contract disputes), the Court should not enforce the delegation clause at Exhibit A, because there is no 'clear and unmistakable' evidence that the parties intended to delegate gateway issues to the arbitrator." *Ciccio,* 2 F.4th at 583.

### 2. The Arbitration Clause Should Be Construed under Florida Law to Exclude Plaintiff's Statutory Claims in this Case

Given that the Contract must be construed against drafter NNM,[2] and NNM now wishes to send this dispute to arbitration (while Plaintiff does not), interpretation should be made with an eye towards construing the ambiguity in Plaintiff's favor (against her claims being compelled to arbitration because only claims arising under the ICA are arbitrable). That aside, the alternate interpretation (that her claims *are* covered by arbitration) simply cannot be squared with the

---

[2] It is readily apparent from the face of the Contract that NNM used a form agreement with blanks to be filled in with a given Contractor's name.

requirement that "the arbitration clause [] be read together with the other previsions in the contract," *Bari Builders*, 155 So. 3d at 1162, or for that matter, common sense. If Defendants' interpretation were to be accepted by the Court, the following interpretations would need to be made. If "Agreement" meant "Arbitration Agreement" (and included the broad scope insisted upon by Defendants), then **ICA ¶ 11(b)** would read, "...Each party agrees that any action by either party to enforce the terms of this [Arbitration] Agreement shall be subject to mandatory arbitration, as set forth in Exhibit A..."  And similarly, inserting "Arbitration Agreement" into paragraph 2 of Exhibit A would also be nonsensical, as it would read "...any dispute or controversy covered by this [Arbitration] Agreement, or arising out of, relating to, or concerning the validity, enforceability or breach of this [Arbitration] Agreement, shall then be resolved by binding arbitration in accordance with the AAA Rules..." **Ex. A ¶ 2.** Reading the Contract in this way would simply make no sense, as one cannot enforce the terms of an arbitration agreement through mandatory arbitration, but one *can* enforce the terms of a general employment (or IC) contract (e.g., failure to pay agreed rates or to perform specified duties) via arbitration. This interpretation is further supported by the absence of express language in the Arbitration Agreement covering statutory claims, such as those under the FLSA and MIWOWA, as well as the doctrine of construing the contract against drafter NNM.

Ignoring the contours in the Florida case law discussed above, Defendants rely on a single unreported federal decision, *Robinson v. Anytime Rentals, Inc.*, No. 2:14-cv-528-FtM-38CM, 2015 U.S. Dist. LEXIS 91957 (M.D. Fla. Feb. 20, 2015) for the proposition that "[o]n facts nearly identical to those in this case and providing persuasive analysis for the issues presented here," the court "found that arbitration of plaintiff's FLSA claims was required by the plaintiff's independent contractor agreement, which used the same 'unlimited' language as at issue here..." MTD at pp. 15. However, *Robinson* contains fatally flawed analysis for several reasons. First, *Robinson* relied on outdated 11th Circuit case law, including that Court's holding that "[t]he FAA creates a presumption in favor of arbitrability; so, <u>parties must clearly express their intent to exclude categories of claims from their arbitration agreement</u>." *Robinson* at *11 (quoting *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1057 (11th Cir. 1998)) (emphasis added). However, this holding (that normal contractual rules do not apply and contracting parties must specifically <u>exclude</u> claims they do not wish to arbitrate, otherwise all claims will be <u>presumed</u> to be arbitrable) flies in the face of the Supreme Court's holding that, "[t]he federal policy [under the FAA] is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 142 S. Ct. 1708, 1713 (2022). The Eleventh Circuit's case law concerning the scope of arbitration clauses clearly endorsed the creation of "novel rules" to give special

treatment to arbitration to the exclusion of general contract interpretation principles, and therefore should no longer be followed. **It was on this exact basis that the Supreme Court in *Morgan* rejected similar prior Eighth Circuit and Second Circuit law which created a special favorable status for arbitration in contract law.** *Id*. ("The Eighth Circuit's arbitration-specific rule derives from a decades-old Second Circuit decision, which in turn grounded the rule in the FAA's policy. See *Carcich* v. *Rederi A/B Nordie*, 389 F. 2d 692, 696 (CA2 1968); *Erdman*, 650 F. 3d, at 1120, n. 4 ("trac[ing] the origins of [the Eighth Circuit's] prejudice requirement to *Carcich*"). "[T]here is," the Second Circuit declared, "an overriding federal policy favoring arbitration." *Carcich*, 389 F. 3d, at 696.").

An unwarranted special treatment and strong preference for arbitration was clearly behind the *Robinson* court's sparse analysis, in which it stated in conclusory terms that "Plaintiff's contention that he is owed overtime compensation pursuant to the FLSA **hangs on the fact that he was 'mischaracterized'** as an independent contractor and thus not paid in accordance with applicable law." *Robinson* at *12 (emphasis added). The *Robinson* court did not analyze the plaintiff's employment contract to reach this holding. Moreover, a plaintiff asserting a wage and hour claim may do so whether or not they sign an "independent contractor agreement." *Saunders* at 338 ("Even without entering this agreement, Saunders could have raised the identical claims."). The assertion of "independent contractor" status is a *defense*

to wage and hour claims (i.e., that the defendant did <u>not</u> employ the plaintiff). There is no requirement that in order for a plaintiff to state a claim under the FLSA, they must plead that the defendant *mischaracterized* them – rather, a plaintiff need only plead that the defendant *employed* them. In such a situation, a plaintiff is not required to plead that the parties entered into an unenforceable IC agreement.  See, e.g., *Duff v. Centene Corp.*, 565 F. Supp. 3d 1004, 1018 (S.D. Ohio 2021) ("the law is settled that a plaintiff need not 'anticipate and attempt to plead around' an affirmative defense at the motion to dismiss stage.") (quoting *United States v. N. Tr. Co.*, 372 F.3d 886, 888 (7th Cir. 2004)).

But a *defense* does <u>not</u> create the *substantial nexus* required by Florida law between the claim asserted and the contract including an arbitration clause, especially where, as here, Plaintiff's claim does not turn on the provisions in an IC agreement. Merely stating that federal policy favors arbitration is no substitute for the rigorous contractual interpretation required by the Supreme Court.

Furthermore, Plaintiff's claims do not "hang on the fact that [she] was *'mischaracterized'* as an independent contractor'" under the terms of the IC Agreement, *Robinson* at *12. Rather, Plaintiff's claim depends upon, whether as a matter of "economic reality," (not labels applied in a contract) she was an employee of Defendants. See *Acosta v. Off Duty Police Servs.*, 915 F.3d 1050, 1055 (6th Cir. 2019) ("To determine whether a worker fits within this expansive definition, 'we

must look to see whether [the] worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic reality,' an employee."). Plaintiff's claims are based on the *economic realities* of her work (including Defendants exercising strong control over her work). For example, Plaintiff alleges that Defendants: (1) administered a writing test to vet her and other Class Members for hire; (2) enforced extensive policies and procedures concerning writing style and SEO, (including on pain of termination); (3) enforced minimum production standards and conducted monthly "quality audits"; and (4) required Class Members to edit their work in accordance with Defendants' policies.  **Compl. ¶¶ 32-43**.  Plaintiff's claims are based on this heavy control and the other realities of her working relationship with Defendants, as well as the fact that Defendants failed to guarantee she receive at least the minimum wage and overtime pay when she worked more than 40 hours in a workweek - <u>not</u> Defendants' self-serving contractual label of Plaintiff and Content Creators as "independent contractors." It cannot reasonably be said that Plaintiff's claims arise out of her IC Agreement with NNM.  In other words, "[e]ven without entering [into the IC] agreement, [Plaintiff] could have raised the identical [wage and hour] claims." *Saunders v. St. Cloud 192 Pet Doc Hosp., LLC*, 224 So. 3d 336, 338 (Fla. 5th DCA 2017).

That Defendants wish to assert an IC *defense* in this litigation by attempting to assign significance to Plaintiff signing a form IC Agreement (divorced from

Defendants' actual control over Plaintiff's work) does not create, under established Florida contract law, a "significant relationship" between her IC Agreement on the one hand and her wage claims on the other hand. *Robinson's* sparse analysis cannot be said to "treat[] arbitration contracts like all others," *Morgan v. Sundance, Inc.*, 142 S. Ct. at 1713, because that decision was clearly instead focused on "fostering arbitration." *Id.*; *Robinson* at *12 ("Moreover, the parties have not expressly excluded disputes pursuant to the FLSA, or even labor disputes generally, from those subject to the mandatory arbitration provision, so the presumption in favor of arbitration applies.") (citing *Paladino*, 134 F.3d at 1057).

Further, Defendants make no effort to reconcile the terms in "[t]he arbitration clause...together with the other provisions in the contract[,]" *Bari Builders*, 155 So. at 1162, and relatedly, Defendants do not engage in any meaningful contractual analysis to explain how two incompatible uses of the term "Agreement" in the IC Agreement and the Arbitration Agreement of the singular contract can be explained to give the entire contract meaning. That is, instead of "read[ing the arbitration clause] together with the rest of the contract[,]" to give all parts of the contract meaning under normal Florida rules of contract interpretation, *Kendall Imps., LLC v. Diaz*, 215 So. 3d 95, 102 (Fla. 3rd DCA 2017), Defendants seek to "devise novel rules to favor arbitration over litigation" *Morgan* at 1713, by flipping the script and

"presum[ing] arbitrability [unless the] parties [] clearly express their intent to exclude categories of claims from their arbitration agreement." *Robinson* at *11.

### E. THE COURT SHOULD NOT STRIKE PLAINTIFF'S CLASS AND COLLECTIVE ALLEGATIONS

Put simply, the class/collective action waiver which is contained in the Arbitration Agreement only applies to claims which fall within the Arbitration Agreement's scope (contract claims, see **ICA 11(b)**). As demonstrated, Plaintiff's claims fall outside the scope of the Arbitration Agreement, and therefore the class/collective action waiver cannot apply to her claims (or those of putative class/collective members). Therefore, the Court should decline to strike any class/collective allegations in this case.

### F. PLAINTIFF HAS ADEQUATELY ALLEGED THAT CLEARVIEW AND NNM ARE A SINGLE EMPLOYER

As Defendants correctly note, under the "single employer" or "integrated enterprise" doctrine, two companies may be considered "so interrelated that they constitute a single employer subject to liability. . ." *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 & n.4 (6th Cir. 1997). "In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, *i.e.*, common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and

boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Id.* at 993-94.

Defendants incorrectly argue that it is "inappropriate" to apply single employer doctrine in wage and hour cases "because the test was developed in the context of the National Labor Relations Act, which has very different policy considerations from the FLSA." **MTD at pp. 23**. Defendants do not develop this argument at all and quickly pivot to arguing why Plaintiff's Complaint does not state a claim against Clearview under the single employer doctrine. Perhaps Defendants' lack of any explanation as to why single employer should not be applied in this case is because federal courts routinely apply the doctrine in FLSA and wage and hour cases. See, e.g., *Reich v. Gateway Press*, 13 F.3d 685, 694 (3d Cir. 1994) ("The minimum wage and overtime requirements apply not only to employees who engage in commerce or in the production of goods for commerce, but also to employees of an "enterprise engaged in commerce." 29 U.S.C. §§ 206, 207. To be considered an enterprise, a business must satisfy three elements. It must 1) be engaged in related activities, 2) under unified operation or common control, and 3) have a common business purpose. 29 U.S.C. § 203(r)(1); *Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 229 (3d Cir. 1991). If a group of businesses have these three characteristics, the businesses will be treated as a single entity for purposes of applying the FLSA."). See also, *Reich* at 695 (the Fourth Circuit found that "three

affiliated businesses--a lounge that featured topless dancers, an adult bookstore, and an x-rated video arcade--were an enterprise because they were all engaged in providing erotic entertainment to adults.") (citing *Brock v. Executive Towers, Inc.*, 796 F.2d 698 (4th Cir. 1986)). It is therefore clear that the single employer doctrine as articulated in *Swallows* applies to this dispute.

Analyzing Plaintiff's allegations under the *Swallows* factors, it is clear that Plaintiff states a claim against Clearview, as a single employer with NNM. As to the <u>first</u> factor (Interrelation of Operations), Plaintiff alleged that both Defendants used the same facilities at Clearview's Stamford, CT headquarters, **Compl. ¶ 54**. As to the <u>second</u> factor (Common Management, Directors and Boards), Plaintiff alleged that NNM and Clearview possessed "common LLC members, executive[s] and owners: Calvin Neider (VP, Manager) and Geoffrey Faux, Jr. (VP, Secretary, Treasurer, Manager)." *Id*. As to the <u>third</u> factor (Centralized Control of Labor Relations and Personnel), Plaintiff alleged that Defendants "utilized the same or similar...labor relations personnel [and] implemented and carried out the same labor relations policies including the compensation policies applicable to Plaintiff and the FLSA Class." *Id*. Plaintiff further alleged that in September 2021 "Clearview purchased a controlling stake in NNM and installed Clearview leadership into NNM leadership positions" and then shortly thereafter "Clearview [drafted] and promulgat[ed] the November 2021 IC Agreements to Class Members." **Compl. ¶**

53. As to the <u>fourth</u> factor (Common Ownership and Financial Control), Plaintiff alleges that in September 2021 "Clearview purchased a controlling stake in NNM and installed Clearview leadership into NNM leadership positions," *Id*. Relatedly, Clearview does not hide the fact that it is a private equity company and NNM is its portfolio company.[3]

In view of the substantial allegations as to each of the single employer factors, as well as the reality that Plaintiff need not prevail on each factor to establish single employer status, Plaintiff has plausibly stated claims against Clearview under the single employer doctrine.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny the Defendants' Motion to Dismiss Plaintiff's Complaint in its entirety.

Dated:  March 26, 2024

/s/ James E. Goodley
**GOODLEY MCCARTHY LLC**
James E. Goodley (PA ID: 315331)
james@gmlaborlaw.com
Ryan P. McCarthy (PA ID: 323125)
ryan@gmlaborlaw.com
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 394-0541

---

[3] "The platform transaction closed on September 3, 2021. Clearview invested equity from Clearview Capital Fund IV, LP and its affiliates, alongside members of Next Net Media's management team." https://www.clearviewcap.com/investment/next-net-media-llc/ (last accessed 3/22/2024).

## <u>LOCAL RULE CERTIFICATION</u>

I, James E. Goodley, certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Date: March 26, 2024                     By: *<u>/s/ James E. Goodley</u>*
                                        James E. Goodley

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 27, 2024, I electronically filed the foregoing document(s) and that they are available for viewing and downloading from the Court's CM/ECF system, and that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: *<u>/s/ James E. Goodley</u>*
James E. Goodley